IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA ) | | |
| For the use and benefit of VT MILCOM, ) | | |
| INC., ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Civil Action No. 5:16-cv-00007 | |
| ) | | |
| PAT USA, INC., *et al.*, ) | By: Elizabeth K. Dillon | |
| ) | United States District Judge | |
| Defendants. ) | | |

**MEMORANDUM OPINION AND ORDER REGARDING SUMMARY JUDGMENT**

This case arises from a subcontract between PAT USA, Inc., and VT Milcom, Inc., whereby VT Milcom was to provide labor and materials for the installation of telecommunications systems in Qatar for a United States Army Corps of Engineers project. VT Milcom brings its action under the Miller Act and asserts three claims: a breach of contract claim against PAT USA, a claim for breach of a surety obligation contract against PAT USA, Gerald Dinkins, Sr., and First Mountain Bancorp (FMB),[1] and a claim for quantum meruit against all three defendants.

The case was initially filed in the Eastern District of Virginia but was transferred to this court. VT Milcom timely moved for summary judgment with many of the facts stipulated by the

---

[1] PAT USA is the principal under the payment bond, Dinkins is the surety, and FMB provides the Irrevocable Trust Receipt.

parties.[2] PAT USA and FMB filed a brief in opposition,[3] and Dinkins filed no response.[4] Before addressing the summary judgment motion, though, the court turns to a preliminary issue—whether it has personal jurisdiction over the defendants.

In their opposition brief, PAT USA and FMB argued that this court lacked personal jurisdiction over them. All defendants filed a 12(b)(2) motion challenging personal jurisdiction when they first responded to the complaint, but they never requested a hearing in this court or submitted the issue to the court without a hearing. Instead, defendants PAT USA and FMB engaged in discovery, amended the scheduling order, entered into stipulations, and only mentioned the issue again in their memorandum in opposition to VT Milcom's motion for summary judgment. Local Rule 11(b) requires a party to set a hearing or advise the court that a hearing is not needed within 60 days after the motion is filed; otherwise, the motion is deemed withdrawn. W.D. Va. Civ. Rule 11(b). Here, defendants' motion is deemed withdrawn, and in any event defendants have waived any challenge to personal jurisdiction. *See, e.g.*, *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704–05 (1982) ("The actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not."); *United States ex rel. Combustion Sys. Sales*, 112 F.R.D. 685, 687 (M.D.N.C. 1986) (noting that waiver of a personal jurisdiction defense "has been inferred in a wide variety of

---

[2] By separate order (Dkt. No. 72), many of VT Milcom's requests for admission have been deemed admitted by the defendants. Regardless of these admissions, the court would reach the same conclusion because it relies upon the joint stipulation of the parties and other undisputed facts in making its decision on summary judgment.

[3] PAT USA and FMB, with their joint opposition to VT Milcom's motion for summary judgment, purported to move for summary judgment as well. (*See* Defs.' Mem. Opp'n, Dkt. No. 57.) However, that motion was filed two weeks after the deadline to file dispositive motions (*see* Order, Dkt. No. 34), so the court will not consider it. W.D. Va. Civ. R. 56(a).

[4] Even though Dinkins filed no opposition to the motion for summary judgment, the court must still determine whether VT Milcom is entitled to summary judgment against him. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

situations, even when the defense has been formally raised in an answer, by conduct and inaction, such as . . . participating in . . . discovery").

## I. BACKGROUND

**A. The Prime Contract and Subcontract**

In October 2013, the United States Army Corps of Engineers (USACE) awarded PAT USA a contract (the Prime Contract) for minor military construction projects on United States facilities in Qatar. As a requirement of that contract, PAT USA provided a payment bond that identified defendant Gerald Dinkins, Sr. as the surety. PAT USA also provided an Irrevocable Trust Receipt issued by defendant FMB. On February 22, 2014, PAT USA entered into a subcontract with VT Milcom (the Subcontract, Compl. Ex. C, Dkt. No. 1), under which VT Milcom agreed to provide labor and materials for the installation of telecommunications systems on the project site in Qatar.[5] After one change order, the total Subcontract fixed-price amount was $485,684.73. VT Milcom subsequently performed work and furnished materials for the project as directed by PAT USA, including shipping materials to Qatar.

On January 29, 2015, PAT USA informed VT Milcom that the Prime Contract was on hold and that USACE was not allowing work on the project. (Compl. ¶ 28; Answer ¶ 28, Dkt. No. 15.) Unbeknownst to VT Milcom and by letter dated January 30, USACE terminated PAT USA for default and for reasons not involving VT Milcom. (Stipulation ¶ 6, Dkt. No. 45.) By email dated January 31, PAT USA arranged for delivery of the balance of the materials by VT

---

[5] The parties agree that "VT Milcom's general scope of work as detailed in the [Subcontract] consisted of the labor and materials to install telecommunications cabling secure and unsecure LAN systems, including the purchasing and shipment of all required materials to the project site at Al Udeid Air Base, Qatar." (Compl. ¶ 10, Dkt. No. 1; Answer ¶ 10, Dkt. No. 15.)

3

Milcom to Qatar.[6] (Pl.'s Br. Ex. A, at 20; Req. for Adm. No. 70, Dkt. No. 43-1; Order, Dkt. No. 72.) Then, by letter dated February 2, PAT USA informed VT Milcom of the Prime Contract termination and terminated the Subcontract, wrongly claiming that VT Milcom had defaulted upon its performance obligations.[7] VT Milcom invoiced PAT USA a total of $208,727.48 for work performed and materials furnished; however, PAT USA only paid VT Milcom $91,617.16. The amount paid constituted 20% of the fixed price. According to PAT USA, that amount is all it owes because Schedule D of the Subcontract lists the payment milestone for material purchase as 20%. VT Milcom subsequently filed this suit, seeking to recover the remaining $117,110.32 invoiced to PAT USA. After discovery and a stipulation by the parties to the majority of the above-stated facts, VT Milcom moved for summary judgment. (Pl.'s Mot. Summ. J., Dkt. No. 51.)

**B. Subcontract Provisions**

The parties rely upon the following provisions of the Subcontract.

**SECTION SIX - SUBCONTRACT AMOUNT**

As full compensation for performance of this Agreement, Contractor agrees to pay Subcontractor . . . subject to all applicable provisions of the Subcontract:

a. The fixed-price of US Dollars Four hundred Eighty two thousand and One Hundred Ninety five and 60/100 only ($ 482,195.60) subject to additions as provided for in the Subcontract Documents.

b. Time and material rates and prices in accordance with the attached Schedule of Labor and Material Costs which is incorporated by reference and identified as Schedule C.

---

[6] There is no information in the record as to why PAT USA arranged for delivery of the materials after the Prime Contract had been terminated. Defendants' counsel, at the hearing, said that PAT USA must not have received the letter from USACE yet. (Hr'g Tr. 29–30.)

[7] Pursuant to the Subcontract, PAT USA had three days to notify VT Milcom of USACE's termination. (Subcontract § 10.)

4

The fixed-price, unit prices and/or time and material rates and prices are referred to as the Subcontract Amount.

. . . .

**SECTION EIGHT - PAYMENT**

The Subcontractor shall, as a condition to payment, provide a schedule of values satisfactory to the Contractor not more than five (5) business days from the date of execution of this Agreement.

. . . .

APPLICATION AND PAYMENTS
The Subcontractor shall submit progress payment applications . . . to Contractor no later than the 20th day of each payment period for the value of the Subcontract Work performed up to and including the last day of the payment period indicating work completed and, to the extent allowed under this Agreement, materials suitably stored during the preceding payment period. Payments will be made to the Subcontractor no later than 3 business days after receipt of payment from the owner for each application period. All payments to the Subcontractor are to be made only equivalent to payments the Contractor receives from the Owner. The Contractor's receipt of payment from the Owner is a condition precedent to the Contractor's obligation to pay the Subcontractor. Contractor and subcontractor share risk of owner payment. Subcontractor's preferred terms for receipt of payment is [sic] Net 30.

. . . .

**SECTION 10 - CONTRACTOR'S RIGHT TO PERFORM SUBCONTRACTOR'S RESPONSIBILITIES AND TERMINATION OF AGREEMENT**

. . . .

**TERMINATION BY OWNER** Should the Owner terminate its contract with the Contractor or any part which includes the Subcontract Work, the contractor shall notify the Subcontractor in writing within three (3) calendar days of the termination and upon written notification, this Agreement shall be terminated and the Subcontractor shall immediately stop the Subcontract Work, follow all of Contractor's instructions, and mitigate all costs. In the event of Owner termination, the contractor's liability to the Subcontractor shall be limited to the extent of the Contractor's recovery on the Subcontractor's behalf. The Contractor agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of the Owner termination and to permit the Subcontractor to prosecute the claim, in the name of the Contractor,

for the use and benefit of the Subcontractor, or assign the claim to the Subcontractor.

**TERMINATION OF SUBCONTRACTOR**  If the Subcontract Work has been stopped for thirty (30) calendar days because the Subcontractor has not received progress payments or has been abandoned or suspended for an unreasonable period of time not due to the fault or neglect of the Subcontractor, then the Subcontractor may terminate this Agreement upon giving the Contractor seven (7) calendar days' written notice.  Upon such termination, Subcontractor shall be entitled to recover from the Contractor payment for all Subcontract Work satisfactorily performed but not yet paid for, including reasonable overhead, profit and attorneys' fees, costs and expenses.  The Contractor's liability for any other damages claimed by the Subcontractor under such circumstances shall be extinguished by the Contractor pursuing said damages and claims against the Owner, on the Subcontractor's behalf.

. . . .

**SCHEDULE C – Price Schedule (Assigned at a later time)**

**Price schedule**

Pricing listed is for the providing and installing materials for the projects communications systems as outlined within this proposal:

VTM's Base Bid Firm Fixed Price (FFP)                $329,923.57

Performance and Payment Bond (if required) ADD

Pricing Break Out:
    C-17 Spare Parts Facility                            $30,202.96
    Cryogenics Facility                                  $35,618.43
    ELRS Storage Facility                                $30,615.30
    Fuel Truck Parking                                   $41,051.43
    Base Fuels Laboratory                                $37,003.26
    C-130 aircraft maintenance Unit (inside 5ft line)    $146,925.65
    OSP Cabling (100 pair from C-130 Bldg)               $ 8,506.54
    Pricing Break Out does not include P&P Bond cost.

Add Alternate Option 1:
VTM is providing an ADD Firm Fixed Price Proposal (FFP) to provide and install the project PDS system in accordance with NSTISSI 7003.

VTM (FFP) Add Alternate (PDS System)            $152,272.03
Performance and Payment Bond (if required) ADD

**The Total Fixed Price, including Add Alternate Option 1, if selected: $482,195.60.**

**SCHEDULE D – Accounting Procedures, Payment Terms and Purchase Order Procedures**

1. Invoicing/payment shall be in accordance with stated milestone objections and completion.
2. Payments to be made within 30 days from the date of submitted invoice.
3. Payment milestone as follows – 20% Upon Material Purchase
                                       60% upon I.T.C.
                                       20% Upon Final Acceptance & handing over

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a court considers a summary judgment motion, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Here, the parties stipulate to the majority of the relevant facts, but offer competing interpretations of the Subcontract.

The Subcontract specifies, and the parties agree, that Michigan law governs its interpretation. Where "[t]he contract provisions are not disputed" and "[o]nly their interpretation and effect . . . are in question," summary judgment is appropriate. *Burroughs Corp. v. Detroit*, 171 N.W.2d 678, 680 (Mich. Ct. App. 1969). Pursuant to Michigan law, the court looks to the parties' intent by examining "the language in the contact, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument." *Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 458–60 (6th Cir. 2006) (citing *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776,

780–81 n.11 (Mich. 2003)). The court should also read the contract as a whole and review "the entirety of the contractual text whenever construing any portion of a contract." *Wilkie*, 664 N.W.2d at 781 n.11. Ambiguity in a contract does not prevent the award of summary judgment as the court may consider extrinsic evidence and grant summary judgment if it "supports only one of the conflicting interpretations." *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 409–10 (6th Cir. 2004) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999)); *see also Washington Metro. Area Transit Auth. v. Potomac Inv. Prop.*, 476 F.3d 231, 234–35 (4th Cir. 2007) (noting that where a contract is unambiguous or is ambiguous but can be interpreted using extrinsic evidence, summary judgment is appropriate) (applying Maryland law).

**B. Breach of Contract**

It is undisputed that VT Milcom provided $117,110.32 in labor and materials to the Project at the direction of PAT USA without payment for the same. It is further undisputed that PAT USA's prime contract was terminated for reasons other than VT Milcom's performance and that PAT USA's actions prohibited VT Milcom from reaching other payment milestones and completing the Subcontract. Relying on these undisputed facts, VT Milcom argues that PAT USA breached the Subcontract by not paying VT Milcom $117,110.32. It contends that PAT USA cannot hide behind the payment milestones or ignore the Termination by Subcontractor provision because PAT USA deprived VT Milcom of the opportunity to reach another milestone and to invoke the Termination by Subcontractor provision. PAT USA, in response and in part, relies upon the Termination by Owner provision of the Subcontract and the limited remedies afforded VT Milcom in that provision.

While there are many provisions of the Subcontract cited by the parties and some that seem to conflict with each other, the Termination by Owner provision applies to the facts here, is clear, and states as follows:

> **TERMINATION BY OWNER** Should the Owner terminate its contract with the Contractor or any part which includes the Subcontract Work, the contractor shall notify the Subcontractor in writing within three (3) calendar days of the termination and upon written notification, this Agreement shall be terminated and the Subcontractor shall immediately stop the Subcontract Work, follow all of Contractor's instructions, and mitigate all costs. **In the event of Owner termination, the contractor's liability to the Subcontractor shall be limited to the extent of the Contractor's recovery on the Subcontractor's behalf.** The Contractor agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of the Owner termination and to permit the Subcontractor to prosecute the claim, in the name of the Contractor, for the use and benefit of the Subcontractor, or assign the claim to the Subcontractor.

(Subcontract § 10 (emphasis added).)

Here, the Owner (USACE) terminated PAT USA's contract, part of which includes the work by VT Milcom, on January 30, 2015. PAT USA notified VT Milcom in writing on February 2, 2015. Thus, it is undisputed that this notification was timely. The only issue is VT Milcom's remedy. On this issue, the provision specifically provides that, "In the event of Owner termination, the contractor's liability to the Subcontractor shall be limited to the extent of the Contractor's recovery on the Subcontractor's behalf." VT Milcom has been paid $91,617.16. Although it claims an additional $117,110.32, there is no evidence that PAT USA has recovered $117,110.322 from the Owner on VT Milcom's behalf.[8] So VT Milcom may not recover those funds.

VT Milcom might wish that the provision included terms that allow VT Milcom to recover for all of its work at the time of termination, particularly since it was not at

---

[8] PAT USA's counsel represented at the hearing that PAT USA appealed its termination for default to the United States Court of Federal Claims, but there is no evidence in the record to that effect. (Hr'g Tr. 25–26, Dkt. No. 68.)

9

fault and PAT USA told it to go ahead with that work, but the Termination by Owner provision does not include those terms. VT Milcom also would like the court to interpret the provision to apply only to a termination that occurs for the convenience of the government and not for default, but again the Subcontract does not distinguish between these two types of termination. Moreover, Section Ten's Termination by Subcontractor provision simply does not apply here, and there is no evidence before this court that VT Milcom gave seven days written notice to PAT USA as required by the provision. VT Milcom is bound by the terms of the contract it signed, and under that contract, it is not entitled to the recovery it seeks.

If the court were to base its decision on whether a party had acted unprofessionally towards another party, had misled another party (whether intentionally or not), or had wrongly accused another party of failing to perform under a contract, then the court would find that PAT USA owed VT Milcom $117,110.32. But the court must look to the terms of the parties' contract, and, on summary judgment, VT Milcom has not shown a breach of the Subcontract by PAT USA.[9]

**C. The Miller Act Claim under the Payment Bond**

Construction and application of the Miller Act are governed by federal law. *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 127 (1974). The Miller Act is "given a liberal construction in order to properly effectuate the Congressional intent to protect those whose labor and materials go into public projects." *United States ex rel. Sunbelt Pipe Corp. v. U.S. Fid. & Guarantee Co.*, 785 F.2d 468, 470

---

[9] Given this ruling, it is not necessary for the court to consider VT Milcom's quantum meruit claim. As VT Milcom concedes, quantum meruit is only appropriate "[s]hould the Court find that the provisions of the subcontract do not address how VT Milcom should be paid for work performed and materials provided where its general contractor was default terminated." (Pl.'s Mot. Summ. J. 20, Dkt No. 51.)

(4th Cir. 1986). Protection is needed for persons supplying labor and material for these public construction projects because liens are not available on these projects. *United States ex rel. Global Bldg. Supply, Inc. v. WNH Ltd. P'ship*, 995 F.2d 515, 518 (4th Cir. 1993). A person who provides labor and materials has a cause of action under the Act "for the amount due," 40 U.S.C. § 3133(b)(1), or "for the sum or sums justly due him," 40 U.S.C. § 270(b)(1) (2001).[10] The Act thus allows a remedy without a lien by providing for a payment bond.

Liability under the payment bond, pursuant to the Miller Act, is not determined by looking only at whether the principal is liable under the underlying contract. Rather, "[i]t is clear that 'the surety's liability on a Miller Act bond must be at least coextensive with the obligations imposed by the Act if the bond is to have its intended effect.'" *United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1206 (9th Cir. 2002) (quoting *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 215–16 (1957)).

The parties disagree as to whether there is a sum or sums justly due to VT Milcom and rely in large part upon *Walton*. In *Walton*, the Ninth Circuit Court of Appeals distinguished between contractual provisions regarding the measure of recovery and provisions regarding the timing of recovery or right of recovery. The court determined that "[w]here subcontract terms effect [sic] the timing of recovery or the right of recovery under the Miller Act, enforcement of such terms to preclude Miller Act liability contradict [sic] the express terms of the Miller Act." *Walton*, 290 F.3d at 1207. There, the contractor failed to pay its subcontractor rent for the subcontractor's equipment. The subcontract had been modified by a settlement agreement that

---

[10] The term "sums justly due" appeared in a prior version of the Miller Act, and so many of the cases discuss that term. But the two terms are interchangeable because the amendments made no substantive changes. *United States ex rel. Acoustical Concepts, Inc., v. Travelers Cas. & Surety Co.*, 635 F. Supp. 2d 434, 439 n.6 (E.D. Va. 2009) (citations omitted).

provided that any further payment to the subcontractor for rental fees "shall only be made when and if paid by the Navy and only to the extent paid by the Navy." *Id*. at 1203. The surety argued that the pay-when-and-if-paid provision had not been satisfied, so no liability attached. *Id*. at 1204. In other words, there was no sum justly due under the Miller Act to the subcontractor because the contractor had not been paid by the Navy. The Ninth Circuit disagreed. It held that the surety and its principal could not rely on the pay-when-and-if-paid provision to avoid liability under the Act. *Id*. at 1205. The court reasoned that allowing the pay-when-paid provision to supplant the subcontractor's rights under the Miller Act would effectively allow the surety to avoid liability on that basis. *Id*. at 1206. And because the pay-when-paid provision was a timing or right of recovery provision and not a measure of recovery provision, recovery under the Miller Act was required. *Id*. at 1207–1209.

VT Milcom contends that, like the pay-when-paid provision in *Walton*, the "20% upon material purchase" provision of its Subcontract is a timing of recovery provision and not a measure of recovery provision, so, under the reasoning of *Walton*, it is entitled to recover under the payment bond.

Defendants counter that the 20% upon material purchase provision is a measure of recovery provision. Thus, they argue it determines the "sums justly due" under the Subcontract and limits the liability under the Miller Act to the twenty percent of the fixed price already paid to VT Milcom because the provision involves the measure of recovery. They also urge, as the defendants did in *Walton*, that this case is similar to two cases discussed by the *Walton* court—*United States ex rel. Woodington Electric Co. v United Pacific Insurance*, 545 F.2d 1381 (4th Cir. 1976), and *Taylor Construction, Inc., v. ABT Service Corp.*, 163 F.3d 1119 (9th Cir. 1998). Although those cases ultimately allowed recovery under the Miller Act, defendants cite them for

the proposition that this court must look to the underlying contract to determine the sums justly due to the subcontractor. *Walton*, 290 F.3d at 1206–07. Defendants contend that the Schedule D provision regarding payment milestones with "20% Upon Material purchase" is a measure of the sums justly due and limits liability under the Miller Act. Stated otherwise, they posit that VT Milcom is only justly due 20% of the contract price because it never reached the next payment milestone.

In *Woodington*, the Fourth Circuit determined, by looking at the underlying contract, that sums justly due could include compensation measured by a share of the profits rather than labor and material cost, and so it allowed the recovery under the Miller Act. 545 F.2d at 1382–1384. In *Taylor*, the Ninth Circuit also looked to the underlying contract to determine the sums justly due where the contract allowed for a percentage of project savings in addition to labor and material costs. The court there allowed recovery of the entire amount under the Miller Act. 163 F.3d at 1120–23. In discussing these cases, the *Walton* court explained that the amounts justly due in those cases could be determined by reference to contract terms because the contract terms set forth measures of recovery. By contrast, "[w]here subcontract terms effect [sic] the timing of recovery or the right of recovery under the Miller Act," courts should not enforce such terms to preclude Miller Act liability because doing so "contradict[s] the express terms of the Miller Act." *Walton* 290 F.3d at 1207. The when-and-if-paid provision was clearly a provision not involving the measure of recovery and thus could not be used to avoid liability under the Miller Act. *Id.* at 1208.

Defendants here argue that the underlying Subcontract provisions limit VT Milcom's measure of recovery to 20% of the fixed price as the sum justly due. Defendants' conclusory argument, however, ignores the other terms of the Subcontract. Section Six of the Subcontract

13

sets forth the Subcontract Amount and includes the fixed-price and time and material rates and prices referenced in Schedule C. Schedule C states that "Pricing listed is for the providing and installing materials for the projects communications systems as outlined within this proposal" and includes a pricing breakout for the various facilities. Shipping and materials are not listed separately in Schedule C. Indeed, Schedule A specifically states that "[s]hipping cost is dispersed proportionately across the task." Most notably, Section Six, regarding the Subcontract Amount, makes no reference whatsoever to a 20% limitation and makes no reference whatsoever to Schedule D—the only portion of the contract that sets forth the payment milestones.

Section Eight regarding Payment provides for progress payment applications "no later than the 20th day of each payment period for the value of the Subcontract Work performed up to and including the last day of the payment period indicating work completed and, to the extent allowed under this Agreement, materials suitably stored during the preceding payment period." The Payment Section notes that "receipt of payment from the Owner is a condition precedent to the Contractor's obligation to pay the Subcontractor," but then in direct contradiction states, "Contractor and subcontractor share risk of owner payment." Schedule D, entitled Accounting Procedures, Payment Terms and Purchase Order Procedures, states that: "1) Invoicing/payment shall be in accordance with stated milestone objections [sic] and completion. 2) Payments to be made within 30 days from the date of submitted invoice. 3) Payment milestone as follows: - 20% Upon Material purchase, 60% upon I.T.C [installation, testing, and commissioning], 20% Upon Final Acceptance & handing over."

Given the terms of the Subcontract, the 20% payment milestone is clearly a timing of payment provision and not a measure of recovery provision. Just like the pay-when-paid provision in *Walton*, the payment milestone cannot be enforced to limit Miller Act liability under

14

the payment bond. To suggest otherwise ignores the Subcontract terms regarding the Subcontract Amount and ignores Schedule C entirely, which the court will not do. *See Armstrong v. United States*, 7 F. Supp. 2d 758, 766–67 (W.D. Va. 1998); *TravCo v. Ward*, 736 S.E.2d 321, 325 (Va. 2012); *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003).

Defendants do not dispute the amount in question—$117,110.32, and VT Milcom is entitled to summary judgment as to its Miller Act claim under the payment bond.

**D. Attorneys' Fees and Costs**

VT Milcom seeks its attorneys' fees and costs and, citing to the Miller Act and *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Insurance Co.*, 86 F.3d 332, 336 (4th Cir. 1996), notes that they are recoverable "if they are part of the contract with the Miller Act claimant."[11] (Pl.'s Mot. Summ. J. 21.) That fees and costs may be recovered in certain circumstances is not in dispute; however, as noted by PAT USA and FMB, the underlying Subcontract only provides for an award of attorneys' fees and costs pursuant to Section Ten's Termination by Subcontractor provision, which, as the court has already determined, does not apply here. So, the court will not award the requested attorneys' fees and costs.

### III. CONCLUSION

For the foregoing reasons, the court hereby GRANTS IN PART and DENIES IN PART VT Milcom's motion for summary judgment. The motion is GRANTED as to VT Milcom's

---

[11] By agreement of the parties and order of the court (Dkt. No. 39), the issue of the amount of any attorneys' fees and costs was bifurcated. Thus, the only issue currently before the court is whether attorneys' fees and costs can be awarded as part of the Subcontract.

claim under the payment bond in the undisputed amount of $117,110.32 and DENIED in all other respects.

Entered: July 14, 2017.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge